## THOMPSON *v.* PERRINE.

1. A town in New York was authorized, upon certain conditions, to subscribe for railway stock, and sell its bonds at not less than their par value to raise funds wherewith to pay therefor. The subscription was made; but the commissioners issued to the company, in exchange for its stock, bonds in which that fact is recited. Such an exchange was not authorized by the statute, and, under the decisions of the courts of that State, a holder of the bonds, who had notice that they had been so exchanged, could not enforce the payment of them. After the passage of the act of April 28, 1871 (*infra*, p. 809), A. purchased them for value, and brought suit upon certain coupons detached therefrom. *Held*, that the legislature had the constitutional power to pass the act, and that the bonds were thereby validated.
2. The court declines to follow *Horton* v. *Town of Thompson* (71 N. Y. 513), in which the same point is involved.
3. *County of Warren* v. *Marcy* (97 U. S. 96) affirmed.

ERROR to the Circuit Court of the United States for the Southern District of New York.

This action was commenced on the first day of May, 1876, by Perrine, against the town of Thompson, a municipal corporation in Sullivan County, New York, for the amount of coupons attached to certain bonds, signed by G. M. Benedict, N. S. Hamilton, and W. H. Cady, county commissioners, and issued by them in the name of the town under date of May 1, 1869. They were purchased by him of Gulick & Van Kleeck, July 20, 1875, he paying cash therefor. Each bond is payable to bearer on the 1st of March, 1899. It recites that it " is a valid security, being issued by virtue of an act entitled ' An Act to authorize certain towns in the counties of Sullivan and Orange to issue bonds and take stock in any company now organized, or that may hereafter be organized within three years after the passage of this act, for the purpose of building

a railroad from the village of Monticello in the county of Sullivan through the towns of Thompson and Forestburgh in said county, and the town of Deerpark in the county of Orange, to Port Jervis, Orange County,' passed May 4, 1868, and of the act amendatory thereof, passed April 1, 1869." And that the promise to pay that sum is "by virtue and in pursuance of the acts above entitled and referred to, and for value received in the stock of the Monticello and Port Jervis Railway Company."

Those acts authorized the commissioners who might be appointed, in the mode therein prescribed, on behalf of any town along the route of the proposed road from Monticello to Port Jervis, to borrow, on its credit, such sums of money, not exceeding thirty-three per cent of the valuation of the town, to be ascertained by its assessment rolls for 1867, for a term not exceeding thirty years, at not exceeding seven per cent interest per annum, and "to execute bonds therefor under their hands and seals," — such debt not, however, to be contracted, and such bonds not to be issued, until there was obtained the written consent of the majority of the taxpayers, appearing upon the last assessment roll, as shall represent a majority of the taxable property, not including lands owned by non-residents; nor until a certain amount of the capital stock of the company had been subscribed in good faith, and paid, by individuals or corporations. The statute required the fact that the persons so consenting represented the proper number of taxpayers, should be supported by the affidavit of one of the town assessors or the town clerk, — the consent and the affidavit to be filed in the offices of the county and town clerks respectively, a certified copy whereof "shall be evidence of the facts therein contained and certified in any court of this [that] State, and before any judge or justice thereof."

The third section of the original act provided that the commissioners thereby authorized "may, in their discretion, dispose of such bonds, or any part thereof, to such persons or corporations, and upon such terms, as they shall deem most advantageous for their said town, but not for less than par; and the money that shall be received by any loan or sale of such bonds shall be invested in the stock of such company, now organized,

or that may hereafter be organized, within two years after the passage of this act, for the purpose of building or aiding in the building of a railroad," from Monticello to Port Jervis.

The entire issue of bonds under the acts referred to was $148,000, of which $15,000 were delivered to the company on the 4th of May, 1869, and $133,000 on the 12th of May, 1869.

Prior to the delivery of the bonds to the railroad company it had made a construction contract with Crowley and Colts, by which the latter were to be paid partly in bonds of towns along the line of the road. In September, 1869, Gulick & Van Kleeck purchased, for cash, eight of the bonds from the National Bank of Port Jervis, at ninety cents on the dollar. In November of the same year, the Atlantic Savings Bank of the City of New York (subsequently known as the Bond Street Savings Bank) purchased $50,000 of the bonds, at eighty-two and one-half cents on the dollar and accrued interest, for cash, and from that institution Gulick & Van Kleeck purchased eighteen of the bonds, Feb. 19, 1875, at seventy-five cents on the dollar. The town, by means of taxation in conformity with the provisions of the original and amendatory acts, met the instalments of interest due March 1, 1870, and Sept. 1, 1870. The road was completed in January, 1871, and has been in operation ever since.

Such was the condition of the enterprise, and such were the relations which the town held to the holders of its bonds, when, on the 28th of April, 1871, the legislature of New York passed an act entitled " An Act to legalize and confirm the acts of the commissioners of the towns of Thompson and Forestburgh, in the county of Sullivan, and of Deerpark, in the county of Orange, in issuing and disposing of the bonds of their respective towns, to build a railroad from the village of Monticello, in the county of Sullivan, to the village of Port Jervis, in the county of Orange, under chapter five hundred and fifty-three of the laws of eighteen hundred and sixty-eight, and to legalize and confirm all bonds heretofore issued by such commissioners under said chapter of laws, now held by or owned by *bona fide* purchasers."

As the facts were undisputed, the court directed a verdict for Perrine, and the town sued out this writ.

Since the present case largely depends upon the construction and effect of the act of April 28, 1871, it is here given in full: —

"SECT. 1. The acts of Nathan S. Hamilton, Giles M. Benedict, and William H. Cady, commissioners on the part of the town of Thompson, and Silas T. L. Norris, Edwin Hartwell, and James Ketcham, commissioners of the town of Forestburgh, in the county of Sullivan, and of Orville J. Brown, Samuel O. Dimmick, and Augustus B. Goodale, commissioners of the town of Deerpark, in the county of Orange, appointed in pursuance of an act entitled ' An Act to authorize certain towns in the counties of Sullivan and Orange to issue bonds and take stock in any company now organized or that may hereafter be organized, within three years after the passage of this act, for the purpose of building a railroad from the village of Monticello, in the county of Sullivan, through the towns of Thompson and Forestburgh, in said county of Sullivan, and the town of Deerpark, in the county of Orange, to Port Jervis,' passed May fourth, eighteen hundred and sixty-eight, in issuing bonds upon the faith and credit of their respective towns, and in exchanging them for the stock of the company, organized for the purpose of constructing the railroad, contemplated by said act, are hereby ratified and confirmed.

"SECT. 2. No bond or bonds issued or purporting to have been issued under the said act, and now held, owned, or possessed by any person or persons, guardian, trustee, or corporation, in good faith or for a valuable consideration, shall be void or voidable by reason of any defect or omission in the consents in writing, of the taxpayers of the said towns of Thompson, Forestburgh, and Deerpark, upon which such bonds were or purport to have been issued in or by reason of said consents, not stating the name of the railroad company in which the taxpayers so signing such consents desired the bonds or the money arising from the sale thereof to be invested. But that the said bonds shall be as valid and effectual for every purpose, as if such defect or omission had not occurred: *Provided,* that such or any exchange of bonds by said commissioners for the stock of said company was made at the par value of the said bonds : *And provided, further,* that the respective issues of the said bonds by their commissioners do not exceed the amount authorized by said act.

"SECT. 3. No action or proceeding at law, commenced or pending, at the time of the passage of this act, shall abate or be discon-

tinued, or be in any way affected by reason thereof; but the same
may be prosecuted or defended, and judgment entered therein, and
all proceedings taken to enforce the same, in the same manner as
now provided by law, and with the like effect as if this act had not
been passed.

"SECT. 4. This act shall take effect immediately."

*Mr. T. F. Bush* for the plaintiff in error.
*Mr. William M. Evarts, contra.*

MR. JUSTICE HARLAN, after stating the case, delivered the
opinion of the court.

Although the act of 1868 required all bonds issued under its
authority to·be disposed of for not less than par, and their pro-
ceeds invested in the stock of the company, the commissioners
exchanged those issued by the town of Thompson directly with
the railroad company for an equal amount of the latter's stock.
This was in violation.of the statute as construed by the Court
of Appeals of New York, in several cases to which we had
occasion to refer in *Scipio* v. *Wright*, 101 U. S. 665. We there
held — following the decisions of the State court, some of which
were made long prior to the passage of the particular enact-
ment now under examination — that a purchaser of town
bonds, having notice that they were exchanged for stock in a
railroad company, in violation of a statute similar to that·of
1863, was not a *bona fide* holder, and could not enforce the
payment of them. We perceive no reason to qualify that rul-
ing, and therefore proceed to the consideration of other ques-
tions not embraced by it.

It is apparent, upon the face of the act of 1871, that the
legislature was advised of the fact that the commissioners had
departed from the statute of 1868, in exchanging the bonds for
stock.in the railroad company. And its manifest intention
was not only to ratify and confirm such exchange, but to pro-
tect any holder of the bonds, who became such in good faith,
for a valuable consideration, against any defence arising out of
defects or omissions in the consents of taxpayers, provided the
exchange was at the par value of the bonds and the issue did·
not exceed the amount authorized by law.

The main argument of counsel for the town is embraced by the following propositions: *First*, That the consents of tax-payers were not such as the acts of 1868 and 1869 required. *Second*, That the bonds were exchanged for stock, in violation of the statute; and since they recite, upon their face, that they were issued "for value received in the stock of the Monticello and Port Jervis Railway Company," there could be no *bona fide* holders thereof in the commercial sense. *Third*, That they were not issued under the seals of the commissioners, as required by the statute. *Fourth*, It was beyond the power of the legislature, by subsequent enactment, to make them valid obligations against the town, without its assent given in proper form. *Fifth*, That no such assent was given.

If it be conceded that the consents were insufficient; that a seal was necessary as evidence of the official authority of the commissioners; that the recitals on the bonds, reasonably construed, gave notice to purchasers that they had been illegally exchanged for stock, when they should have been disposed of or sold, at not less than their par value, and their proceeds invested in the stock of the company, — the town is, nevertheless, liable, if the curative act of April 28, 1871, was within the constitutional power of the legislature to pass. While this question, in some of its aspects, may be one of general jurisprudence, — involving a consideration of the limits which, under our form of government, are placed upon legislative and judicial power, — it is proper to inquire as to the course of decisions in the highest court of New York upon the authority of the legislature to pass such an act. This becomes necessary in view of the fact that the Court of Appeals of that State has adjudged the act, in its main features, to be unconstitutional. That adjudication, it is contended, is conclusive of the rights of parties in this case. As we are unable to give our assent to this view, it is due to that learned tribunal that we should state, with some fulness, the reasons for the conclusion which we have reached.

Prior to the year 1858 the question arose in several cases pending in different inferior courts of New York as to the constitutional power of the legislature to authorize or require municipal corporations to subscribe for stock in railroad com

panies, or to issue bonds therefor. The decisions disclosed a conflict of opinion among judges of recognized ability. The question finally came before the Court of Appeals in the year 1858, in *Bank of Rome* v. *Village of Rome*, 18 N. Y. 38. It was there ruled that the State Constitution did not, in terms, or by necessary intendment, restrain the legislature from conferring upon municipal authorities the power to subscribe to the stock of a railroad corporation, and by taxation to raise the necessary funds for the payment thereof. That decision was approved in 19 N. Y. 20. In *People* v. *Mitchell* (35 id. 551), decided in 1866, the court quote, with approval, our decision in *Thompson* v. *Lee County* (3 Wall. 327), where, speaking by Mr. Justice Davis, we said that although a county or other municipal corporation has no inherent right of legislation, and can exercise no power not conferred upon it, in express terms, or by fair implication, the legislature, "unless restrained by the organic law, has the right to authorize a municipal corporation to take stock in a railroad or other work of internal improvement, to borrow money to pay for it, and to levy a tax to repay the loan" and that such authority "can be conferred in such a manner that the objects can be attained, either with or without the sanction of the popular vote."

The decision in *People* v. *Mitchell* is important in other aspects of the present case. The main question was as to the validity of a confirmatory statute, the object of which was to cure the defects in certain affidavits filed in proof of the consent of taxpayers to a proposed municipal subscription of stock in a railroad company. The statute declared that the affidavits should be valid and conclusive proof in all courts and for all purposes, to authorize and uphold the respective subscriptions of the stock and the issue of bonds to the amount specified therein, and that the bonds should be valid and binding on the municipality issuing them, without reference to the form or the sufficiency of the affidavits. The court, referring to the confirmatory statute, said that "it was within the scope of legislative authority to modify the limitations and restrictions in the antecedent acts on this subject, to dispense with prior conditions, and to charge the commissioners with defined and imperative duties." And it quotes with approval our

language in *Thompson* v. *Lee County*, where, referring to a curative statute passed by the Iowa legislature, we further remarked, that " if the legislature possessed the power to authorize an act to be done, it could, by a retrospective act, cure the evils which existed, because the power thus conferred had been irregularly executed."

Thus stood the doctrines of the State court upon the question of municipal subscriptions and as to the power of the legislature, by retrospective enactment, to cure defects in the exercise of powers granted to municipal corporations, when the act of April 28, 1871, was passed. But in 1873 the Court of Appeals decided *People* v. *Batchellor*, 53 N. Y. 128. That was a case of municipal subscription to a railroad corporation under an act passed in 1867, similar, in its main features, to the one passed in 1868 in reference to the Monticello and Port Jervis Railroad Company. It was claimed that the statute had not been complied with in obtaining consents from taxpayers. A subsequent act of the legislature required the subscription to be made upon the consents filed, which the court found not to be such as were prescribed by the statute under which they had been obtained. Without any subscription having been made, or bonds issued, a *mandamus* was sued out to compel the town to become a stockholder in the company, and to issue its bonds in payment of the subscription price of the stock. The court held that the consents of the taxpayers did not embrace such an issue of bonds as the subsequent act required; and that the legislature could not compel a municipal corporation to subscribe stock or issue bonds in aid of the construction of the road of a company, which, although public as to its franchise, was private as to the ownership of its property and its relations to its stockholders. The opinion was concurred in by four of the judges, one concurred in the result, one dissented, and one did not vote.

In *Town of Duanesburgh* v. *Jenkins* (57 id. 177), decided in 1874 by the commission of appeals, — of concurrent jurisdiction and equal authority with the Court of Appeals, — the court, by Johnson, J., reviewed the prior cases in the Court of Appeals involving the questions discussed in *People* v. *Batchellor*. In reference to the latter case it was intimated that the

language of the court upon some of those questions was not
in harmony with its previous decisions, and that the opinion
should be limited to the point adjudged upon the facts exist-
ing in that case. After a careful analysis of those decisions,
the conclusions announced were that the authority of the leg-
islature to enable towns and other civil divisions of the State
to subscribe for stock and issue bonds in aid of a railroad
company, had been established by numerous decisions of the
highest court of the State; that there was no distinction in prin-
ciple between a law authorizing a town, upon a popular vote,
to subscribe for such stock and issue bonds therefor, and a
law directing the same thing to be done; that when the au-
thority to subscribe was made to depend upon the consent of
the town, it was in the discretion of the legislature to prescribe
how such consent shall be given; and that, if it originally
rested with the legislature to fix the terms on which the towns
might act, the same power could remit a part of the conditions
imposed, or heal any defects which may have occurred in the
performance by the town of those conditions. Much of the
language in that case is strikingly applicable to the one in
hand. Said the court: "In this case the commissioner has
been regularly appointed under the statute, by whom bonds
were to be issued and stock subscribed for, provided certain
consents were obtained and proofs filed according to the re-
quirements of the several acts upon the subject. Consents were
obtained, and proofs were made and filed, which are now on
the one side claimed to be, and on the other are denied to be,
in conformity to the law. The commissioner meanwhile ex-
ecuted the bonds, subscribed for stock, and delivered the bonds
to the company in payment of the subscription; complying
with the requirements of the statute in all respects, if the
requisite consents had been given and proof made. The only
officer of the town who had any duty in the premises acted by
signing the bonds; and the legislature, seeing the whole mat-
ter, released the conditions which it had imposed, and declared
his assent binding upon the town, if the bonds had been issued
and the road had been built, and the bonds in that case obliga-
tory. As it might have authorized action in this way and on
these conditions by the town originally, I see no objections to

giving effect to its ratification of, the action of the town, and holding its consent thus expressed effectual." Again said the court: " In this case the proper officer of the town has acted, the bonds have been issued, and the stock subscribed for. The objection is that the proof of preliminary consents by tax-payers is defective. The action of the legislature is, in my judgment, sufficient to heal this defect, and to sanction the action of the town commissioner in binding the town, the whole consideration to the town having been received in the completion of the road and the issuing of the stock for its benefit."

In *Williams* v. *Town of Duanesburgh* (66 N. Y. 129), decided in May, 1876, the Court of Appeals of New York recognized the correctness of the principles announced in *People* v. *Mitchell* and *Town of Duanesburgh* v. *Jenkins*, citing, among other authorities, *Gelpcke* v. *Dubuque*, 1 Wall. 175; *Thompson* v. *Lee County*, 3 id. 327; *Beloit* v. *Morgan*, 7 id. 619, and *St. Joseph Township* v. *Rogers*, 16 id. 644. Alluding to the statutes for bonding towns in aid of railroads, the court held that the legislature could overlook the defective execution of the power conferred, and, by retroactive legislation, cure defects in the action of municipalities under those statutes. The legislature may, said the court, " by subsequent legislation, when there has been a failure to perform conditions precedent, and the bonds have been issued, dispense with such conditions, and ratify and confirm, and make valid and obligatory upon the municipality, bonds issued without such performance, — at least it may do so in cases where the municipality has, through the construction of the road, or by the receipt of the stock of the company in exchange for the bonds, received the benefit which the statute contemplated as the equivalent for the liability it was authorized to incur. The officers authorized under these statutes to issue the bonds are public agents, and the legislature, looking over the whole matter, may, when in its judgment justice requires it, ratify and confirm their acts, which otherwise would be valid. In this case, the legislature could originally have authorized the bonds of the town of Duanesburgh to be issued under the precise circumstances existing when they were issued, and if the acts of the commissioner have, by subsequent legislation, been ratified, it is equivalent author-

ity to do what has been done." It is worthy of remark, in this connection, that Allen, J., had held, in *Clark* v. *City of Rochester* (13 How. (N. Y.) Pr. 204), decided in 1856, that the legislature had no power under the Constitution to delegate to, or confer upon, municipal corporations authority to subscribe for or to hold stock in railroad corporations, and to issue bonds in payment therefor. Nevertheless, in *Williams* v. *Town of Duanesburgh* (Church, C. J., concurring with him), he recognized *Town of Duanesburgh* v. *Jenkins* as authority, and as declaratory of the law.

But it is contended that the Court of Appeals of New York, in the later case of *Horton* v. *Town of Thompson* (71 N. Y. 513), has decided the identical statute under examination to be unconstitutional, and that this court is bound by the decision. The case was commenced about the time the Circuit Court of the United States for the Southern District of New York sustained the validity of that statute, and gave judgment against the town for the amount of some of the bonds embraced in the issue of $148,000. *Cooper* v. *Town of Thompson*, 13 Blatchf. 434. *Horton* v. *Town of Thompson* was decided in the Supreme Court of the State after the present action was instituted. It was a suit upon two interest coupons of $35 each, belonging to the same issue of bonds. It was finally determined in the Court of Appeals shortly before the trial of this case in the court below. The questions raised were, whether the consent of the taxpayers was defective in not naming the railroad to the construction of which the fund should be applied; and whether the validating act of April 28, 1871, in so far as it declared the exchange of bonds for stock to be legal, was not unconstitutional. Upon the first question the court said, that as the consent was sufficiently comprehensive in its terms to embrace the road in question, and inasmuch as the legislature might legally have authorized it to be in the form in which it was actually given, the act of 1871 "probably cured the defect in its form." But the court, passing that question as one that need not be finally determined, held, upon the authority of *People* v. *Batchellor*, that the legislature had no power to authorize, or direct, the commissioners originally to contract the debt without any consent

or action upon the part of the town; and, that since the consent of the taxpayers was not given for an issue of bonds to be exchanged for stock, the legislature could not validate the bonds and make them binding obligations upon the town, in the hands at least of those who were informed, by their recitals, that, in violation of the statute, they had been exchanged for stock in the railroad company. Four of the judges concurred in the opinion, and three dissented.

It is to be observed that the court does not refer to or overrule *Bank of Rome* v. *Village of Rome*, *People* v. *Mitchell*, *Town of Duanesburgh* v. *Jenkins*, or *Williams* v. *Town of Duanesburgh*, *supra*.

We are unable to reconcile *Horton* v. *Town of Thompson*, upon the points now raised, with the doctrines of those cases or of others decided in the Court of Appeals prior to *People* v. *Batchellor*. It certainly cannot be said that there is such an established, fixed construction by that court of statutes similar to those of 1868 and 1869, or to the confirmatory act of 1871, as obliges us to follow *Horton* v. *Town of Thompson*, or that will justify any one in saying that the present question is finally at rest in the courts of that State. But independently of any such consideration, there are conclusive reasons why we cannot, in opposition to our own views of the law, as expressed in numerous cases, accept the principles of that case as decisive of the rights of the present parties. When the act of April 28, 1871, was passed, it was the established doctrine of the highest court of New York, as it was of this court, that the legislature, unless restrained by the organic law of the State, could authorize or require a municipal corporation, with or without the consent of the people, to aid, by a subscription of capital stock, in the construction of a railroad, having connection with the public interests of the people within the limits of such municipality, and to provide for payment by an issue of bonds or by taxation; that defects or omissions, upon the part of such municipal corporation or its officers, in the execution of the power conferred, or in the performance of the duty imposed, could be cured by subsequent legislation, — certainly, where the corporation had received the benefits which the original subscription was designed to secure. As, therefore, the legis-

lature might, in the original act under which these bonds were issued, have authorized or required the bonds to be exchanged directly with the railroad company for capital stock, it could ratify and confirm such exchange, even where originally illegal, so as to make them binding obligations upon the town in favor of all who then held, or might thereafter acquire, them, in good faith or for a valuable consideration. It is, therefore, an immaterial circumstance that the recitals in the bonds may have furnished notice that they were issued originally in violation of the statute. That was the very difficulty which the act of 1871 was designed to remove, and, as matter of law, it was removed, if regard be had to the settled doctrines of this court, or to the decisions of the highest court of the State rendered previously to, and which were unmodified at, the passage of that act. It results that from that moment the bonds, by whomsoever held, whether by the railroad company or by others, became binding obligations upon the town, as much so as if they had originally been sold and their proceeds invested in the stock of the railroad company, as required by the acts of 1868 and 1869. If the rights of those holding the bonds were in any degree affected by the subsequent decision in *People* v. *Batchellor*, the later decision in *Town of Duanesburgh* v. *Jenkins* restored the law, so far as the courts of New York were concerned, as it undoubtedly was declared to be at the time the act of 1871 was passed. The defendant in error acquired the bonds in suit in 1875, before the decision in *Horton* v. *Town of Thompson*, and when, according to the principles announced in *Town of Duanesburgh* v. *Jenkins* and many prior cases in the Court of Appeals, the act of 1871 must have been sustained as a valid exercise of legislative power. He purchased them for value at public auction in the city of New York, without notice of any defence thereto, or of the pendency of any suit involving their validity. If the recitals in the bonds gave notice that the acts of 1868 and 1869 forbade their exchange for stock, and required them to be sold and their proceeds invested in such stock, the purchaser is also presumed to have known, not only that such exchange had been legalized by the act of 1871, but that the authority of the legislature to pass that act was sustained by the decisions of the highest court of the State rendered prior to

its passage.  His rights, therefore, should not be affected by a decision rendered after they accrued, which decision is in conflict with the law, as declared not only by this court in numerous cases, but by the highest court of the State, at and before the time he purchased the bonds.

The assignments of error present another question which it is our duty to notice.

The town pleaded in bar of the action a judgment of the Supreme Court of the State in an action commenced in June, 1869, by the attorney-general of the State, on the relation of Charles Kilbourne and others, taxpayers, against the Commissioners of the Town of Thompson, F. C. Crowley, C. L. Colt, William D. Colt, the Monticello and Port Jervis Railway Company, and the Town of Thompson.  A temporary injunction was obtained on 24th June, 1869, restraining the respondents and each of them from using, loaning, or selling the bonds and from executing any other bonds based upon the consents given by the taxpayers.  But that injunction was vacated and set aside on 27th July, 1869.  A final decree was rendered in 1872 by which the bonds were declared to be null and void, and they as well as the certificates of stock exchanged therefor directed to be delivered up, by the respective parties, and cancelled.  The general ground upon which the decree rested was that the provisions of the act under which they were issued were not complied with.  From that judgment no writ of error or appeal seems to have been prosecuted.  We have already seen that the entire issue of bonds was delivered to the railroad before the commencement of that action, that is, in May, 1869; and that after the dissolution of the injunction, to wit, in September and November, 1869, a large portion of the bonds had found their way into the hands of others who purchased them for value and without any notice of the pendency of the suit in the Supreme Court.

There is an insuperable difficulty in the way of plaintiff in error using the judgment in that case to defeat the present action.  The bonds were negotiable securities, which had passed from the town before the action in the Supreme Court of the State was commenced.  Those who purchased them, in the market, pending that litigation, or after it terminated,

without notice of the suit, and in good faith, for value, could not be affected by the final decree. Had the complainants caused them to be surrendered to the custody of the court, pending the suit, they could have been cancelled in pursuance of the directions contained in the final decree. But the actual custody of the railroad company was never disturbed, nor sought to be disturbed. The knowledge by its officers of the objects of the action, or of the terms of the final decree, could not affect a *bona fide* purchaser for value who had no such knowledge. Our decision in *County of Warren* v. *Marcy* (97 U. S. 96), which is partly based upon adjudications in the courts of New York (*Murray* v. *Lylburn*, 2 Johns. (N. Y.) Ch. 441, and *Leitch* v. *Wells*, 48 N. Y. 585), is conclusive upon this branch of the case.

It is scarcely necessary to say that the decree of the Supreme Court of the State can derive no special force, as against the defendant in error, by reason of the third section of the act of April 28, 1871. That section only protected from the operation of the act any action or proceeding at law, commenced or pending at the time of its passage. That provision furnishes, perhaps, an explanation of the failure of the Supreme Court, in its opinion, to refer to the act of 1871, which had passed before its final decree was entered. The purpose of the third section was only to require existing actions or proceedings at law to be determined without reference to that act, and does not affect the rights of a *bona fide* purchaser who was not a party to the suit, and was without notice of its pendency.

We perceive no error in the record.

*Judgment affirmed.*