GRAY (UNITED STATES v.). See Cases Nos. 15,251–15,253.

---

## Case No. 5,731.

### GRAY v. YORK.

[15 Blatchf. 335.] [1]

Circuit Court, N. D. New York. Nov. 12, 1878.

BONDS OF TOWNS IN NEW YORK — SUBSCRIPTIONS TO STOCK OF RAILROAD CORPORATION — LIABILITY ON COUPONS.

Under the act of the legislature of New York, passed May 18, 1869 (Laws N. Y. 1869, p. 2303, c. 907), commissioners were appointed to issue the bonds of a town and invest the proceeds in the stock of a specified railroad corporation. The commissioners subscribed for the stock, but, before the bonds were issued, the corporation was merged in a new corporation, by proceedings taken under a general statute in force when the proceedings to appoint such commissioners were taken, which provided that all debts due to the old corporation, and all stock subscriptions belonging to it, should vest in the new corporation. After the stock was subscribed for, the provisions of such general statute were extended to said two corporations by a special act. The bonds were issued to the new corporation. Afterwards, by a special act, the issuing of the bonds to the new corporation was ratified, and the bonds were declared to be binding on the town. In a suit to recover on coupons attached to the bonds: Held, that the town was liable on the coupons.

[This was a suit by Charles F. Gray against the town of York.]

Spencer Clinton, for plaintiff.

Theodore Bacon and Henry R. Selden, for defendant.

WALLACE, District Judge. By the order of the county judge of Livingston county, predicated upon a petition by a majority of the tax payers of the town of York, and pursuant to the provisions of the act of May 18, 1869 (Laws N. Y. 1869, p. 2303, c. 907), the persons who signed and issued the bonds in question were appointed commissioners, with authority to create and issue the bonds of the defendant, to the amount of $100,000, and invest the same, or the proceeds thereof, in the stock of the "Northern Extension of the Rochester, Nunda and Pennsylvania Railroad Company." The commissioners duly subscribed for the stock, but, before the stock was delivered, and before any bonds were issued in payment of the subscription, the corporation became merged in

the "Rochester, Nunda and Pennsylvania Railroad Company," a new corporation, created by the consolidation of several corporations. This consolidation was attempted to be effected under a general statute of the state (Act May 20, 1869; Laws N. Y. 1869, p. 2399, c. 917), authorizing the consolidation of railroad companies, which was in force at the time the proceedings were instituted pursuant to which the commissioners were appointed; and this statute, among other things, provided, "that all debts due, on whatever account, to either of said (consolidating) corporations, as well as all stock subscriptions, and other things in action, belonging to either of said corporations, shall be taken and deemed to be transferred to, and vested in, such new corporation, without further act or deed." By an act of the legislature of the state, passed May 17, 1872 (Laws N. Y. 1872, p. 1825, c. 764), and after the commissioners had subscribed for the stock, the provisions of the general act were extended to the Northern Extension of the Rochester, Nunda and Pennsylvania Railroad Company, and to the Rochester, Nunda and Pennsylvania Railroad Company. The commissioners issued and delivered the bonds to the new corporation, and thereafter the bonds came to the possession of the Buffalo Savings Bank, with full knowledge by the officers of the bank of the origin and history of the bonds. Subsequently, on February 22d, 1873, an act was passed by the legislature of the state of New York (Laws N. Y. 1873, p. 19, c. 24), ratifying and confirming the acts of the commissioners in issuing the bonds to the new corporation, and declaring that the bonds should be valid and binding upon the defendant. The plaintiff is a purchaser of coupons originally attached to these bonds, for the payment of interest maturing September 1st, 1877, and March 1st, 1878. He purchased the coupons after those payable September 1st, 1877, became due.

Upon these facts the question first arises, whether or not the acts of the commissioners in taking the stock from, and issuing the bonds to, the new corporation, were obligatory upon the town, irrespective of the operation of the validating act of the legislature. The commissioners were authorized to subscribe for stock in a designated and existing corporation, possessing an organization and advantages peculiar to itself. They were invested with no discretion, but were limited to the strict terms of the authority conferred by the statute, and of the order which gave effect to the statute. If they had subscribed originally for the stock of the new corporation, it could not be contended for a moment that their act would have been binding upon the town. These considerations, however, fall short of reaching the real question to be solved. The commissioners did pursue their lawful authority in subscribing for the stock of the original corporation. Could this

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

subscription have been enforced against the town by the new corporation? If it could, the commissioners have done only that which they were in duty bound to do, and their principal cannot question the acts of its agents in this behalf. When the town, by the action of its tax payers, expressed in the mode sanctioned by the statute, concluded to become a stockholder in a railroad company, it consented to assume and occupy towards the company the same relations as those of any individual stockholder. Its contract was subject to the same implications, depended upon the same conditions, conferred upon the railroad company the same rights, and imposed upon the town the same liabilities, as that of an ordinary subscriber for stock; and, however unwise may have been the legislation which permitted it to make such a contract, and however unfortunate may be the results which have ensued from the contract it made, its rights must abide the same test which would be applied if an individual, instead of a municipal corporation, were a party to the subscription.

The town subscribed for stock in a company which, by the statutes under which it existed, was permitted to merge itself in another corporation, without sanction from, or consultation with, a subscriber for its stock, and not only to do this, but also to transfer to the new corporation all its subscriptions for stock, and all its other rights of action, by the mere process of consolidation, and the right thus reserved to the corporation entered into, and became one of the conditions of, the subscription made by the town. In other words, the town agreed to become a stockholder in a corporation which might consolidate itself in another corporation, without any further consent on the part of the town.

The contract of subscription implies the right on the part of the corporation to effect such changes in its organization and operations as are permitted under the powers reserved in the charter or act of incorporation; and, accordingly, it has been often decided, that a subscriber for stock is not released from his obligation because, subsequently, the corporation has availed itself of the power thus reserved. Even where the power is reserved by the legislature. in the act of incorporation, to alter or amend the act, a subscriber for stock is not released, when, by subsequent legislation, the capital of the corporation is increased, or the sphere of its operations is extended. To have this effect, the alterations must be so extensive and radical as to virtually subvert the corporation itself.

It will not be profitable to discuss the principles upon which these decisions rest. It seems reasonable to say, that a subscriber consents in advance to the changes which may be made by the legislature in the charter of a corporation, where the right to do so is reserved, or to any changes which may be made by the corporation itself, under the authority of its charter or act of incorporation, when those changes are not so radical as to deprive him of the substantial benefits of the contract into which he has entered. But, it seems hard to reconcile with the principles of the law of contracts, the position, that he is bound by the obligations of a contract with a corporation, when the corporation, by its own act, has put it out of its power to make substantial performance on its own part. In the present case, the defendant subscribed for stock in a corporation, which, by its own act, deprived itself of the power to deliver the stock, and the defendant is now asked to accept, in substitution, stock in another corporation, constituted with a much larger capital, operating an extended line of road, and presenting an investment of a very different character from that originally contemplated. The case, however, is precisely similar to that of Nugent v. Supervisors, 19 Wall. [86 U. S.] 241, where it is said, by Mr. Justice Strong, that, "in a multitude of cases decided in England and in this country, it has been determined, that a subscriber for the stock of a company is not released from his engagement to take it and pay for it, by any alteration of the organization or purposes of the company, which, at the time the subscription was made, were authorized, either by the general law or by the special charter, and a clear distinction is recognized between the effect of such alterations and the effect of those made under legislation subsequent to the contract of subscription." "They uniformly assert, that the subscriber for stock is released from his subscription by a subsequent alteration of the organization or purposes of the company, only when the alteration is both fundamental and not provided for or contemplated by either the charter itself or the general laws of the state." This was a case where the corporation, after the subscription and before the stock was delivered, consolidated, under the provisions of its act of incorporation, with another corporation, and took the name of the latter. This consolidation was effected at the instance of the subscriber, but no notice is taken of this circumstance, in the opinion of the court. The opinion proceeds upon the doctrine, as stated therein, that "it was contemplated by the legislature, as it must have been by all the subscribers to the stock of the company, that precisely what has occurred might occur," and that "subscribers must be presumed to have known the law of the state, and to have contracted in view of it," and cites, as sustaining its conclusions, Sparrow v. Evansville & C. R. Co., 7 Port. [7 Ind.] 369, where the consolidation took place without the knowledge or consent of the subscriber. Bish v. Johnson. 21 Ind. 299, and Bishop v. Brainerd, 28 Conn. 289. The same doctrine is reaffirmed, and the same conclusion reached, in East Lincoln v. Davenport, 94 U. S. 801, where the town was held liable upon

similar facts with those in the present case. Mr. Justice Hunt says: "All this" (the consolidation) "was provided for in the charter of the original company, to which the town subscription was made, and the subscription was made with the knowledge of the town, that new organizations might be made, and that the subscription was liable to be transferred to, and its stock to become that of, another company." To the same effect is the case of County of Henry v. Nicolay, 95 U. S. 619, where the company to the stock of which the county subscribed, consolidated, after the subscription, with another company; in which case Mr. Justice Bradley says, speaking of the effect of the consolidation upon the liability of the county: "Had the company ceased to exist, it would make no difference."

The case has thus far been considered as though the several railroad corporations had consolidated at the time the bonds were issued. It is insisted, however, that the corporations which attempted to consolidate, were not authorized by law to do so, inasmuch as neither of them were roads in operation, and the statute authorizing consolidation of roads only applies to companies "operating a railroad * * * within, or partly within and partly without, this state." The statute declares, that "it shall and may be lawful for any railroad company or corporation, organized under the laws of this state, or of this state and any other state, and operating a railroad or bridge, either wholly within, or partly within and partly without, this state, to merge and consolidate its capital stock, franchises and property, with the capital stock, franchises and property of any other railroad company or companies, organized under the laws of this state, * * * whenever the two or more railroads of the companies or corporations so to be consolidated, shall or may form a continuous line of railroad with each other, or by means of any intervening railroad, bridge or ferry." The corporations here were neither of them operating a railroad. They contemplated doing so at some future time. It seems quite clear, that neither of them was within the description of corporations to which the statute extends, as it confers power to consolidate upon such corporations only as are operating railroads within, or partly within, this state, which may form, by the consolidation, a continuous line of railroad.

The question then arises as to the effect upon the rights of the parties, of the act of the legislature extending to these railroad corporations the provisions of the general act authorizing corporations to consolidate. This act was passed after the commissioners for the town had made the subscription for stock. The statutes under which the original company was incorporated, did not permit it to consolidate itself with another corporation, there was no general statute permitting such a corporation to consolidate, and, conceding the power of the legislature to alter or amend

the statutes under which it was incorporated, so far as to permit it to merge itself in another corporation, with an increased capital and an extended sphere of operations, it yet remains to determine whether such legislation did not work such fundamental changes in the character of the corporation, as to absolve the town from obligation upon its subscription. By this legislation, it was permitted to the corporation to surrender its franchises and destroy its own identity. Such a result is not in accordance with what was the understanding of the parties to the subscription, or what could have been within their legal contemplation when the subscription was made. When the original corporation availed itself of a statute passed after the subscription was made, by which it transferred its franchises and property to another corporation, and ceased to exist, and this action was not warranted by the statutes under which it was incorporated, or by any general law of the state, existing when the subscription was made, it must be held that the town was absolved from the obligations of a contract which could not have contemplated such a contingency.

Notwithstanding this, the plaintiff is entitled to recover. The act of the legislature, passed after the bonds had been issued, validating the acts of the commissioners in issuing the bonds, and declaring the bonds valid and binding upon the town, was a ratification, by the legislature, of a proceeding which they might have authorized originally. The case of Horton v. Town of Thompson, 71 N. Y. 513, is cited as an authority to the contrary, but that case was decided by a divided court, and is in conflict with Town of Duanesburgh v. Jenkins, 57 N. Y. 177, and Williams v. Town of Duanesburgh, 66 N. Y. 129. Whatever may be the state of the decisions of the state courts, the question is not an open one in this court. As was said in Beloit v. Morgan, 7 Wall. [74 U. S.] 619: "Whenever it has been presented, the ruling has been, that, in cases of bonds issued by municipal corporations, under a statute upon the subject, ratification by the legislature is, in all respects, equivalent to original authority, and cures all defects of power and all irregularities in its execution." The decisions of the state court upon this question are not obligatory as the rule of decision here. Venice v. Murdock, 92 U. S. 494.

Judgment is ordered for the plaintiff, for $6,685.88.